IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

SANTOS ANDUJAR,

              Plaintiff,

    v.

GENERAL NUTRITION CORPORATION,

              Defendant.

Civil No. 14-7696(JS)

## OPINION

This matter is before the Court on defendant's "Federal Rules of Civil Procedure 50(b) and Rule 59 Motion for a New Trial or, In the Alternative, Amending the Judgment Dismissing All Claims Against General Nutrition Corporation" ("motion") [Doc. No. 74]. The Court received plaintiff's response [Doc. No. 80] and defendant's reply [Doc. No. 82]. The Court exercises its discretion to decide the motion without oral argument. See Fed. R. Civ. P. 78; L. Civ. R. 78.1. For the reasons to be discussed, defendant's motion is denied.[1]

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of this Court to hear the case. [Doc. No. 10].

**Background[2]**

Plaintiff, Santos Andujar, began his employment with defendant, General Nutrition Corporation ("GNC"), in 1999 as a sales associate. Tr.1 at 115:3-17.[3] Plaintiff was promoted to the position of store manager in 2001 and remained in that position until his termination on February 26, 2014 at age 57. Id. at 109:13-110:24; 155:20-116:21. Throughout his employment with GNC, plaintiff received numerous awards and accolades from the company. Id. at 139:11-140:25. Defendant classified each store as "A, B, C or D" based on sales, profits and store growth. Tr.2 at 313:18-314:18.[4] During plaintiff's employment as a store manager, he improved his store's classification from a "D" store to a "B" store. Tr.1 at 115:17-116:15.

Plaintiff was also evaluated annually for his performance as a store manager from 2002 to 2014 through defendant's Performance Evaluation Process ("PEP"). Tr.2 at 232:4-21. The maximum score possible on the PEP evaluation is 500, with 300 considered to be a "passing" score. Id. at 232:21-233:1. In 2014, plaintiff's PEP

---

[2] The parties are familiar with the facts of the case. Accordingly, the Court will provide only a brief recitation of the facts to the extent necessary to resolve defendant's motion.

[3] Tr.1 refers to the transcript of trial proceedings held on October 24, 2017. [Doc. No. 69].

[4] Tr.2 refers to the transcript of trial proceedings held on October 25, 2017. [Doc. No. 70].

score was 287, which was considered to be a failing score. Id. at 247:21-248:4.

In addition to the PEP, each of defendant's stores is evaluated annually through an assessment known as a Critical Point Audit ("CPA"). Id. at 233:2-19. The passing score on a CPA is 90%. Id. at 234:12-13. Plaintiff's store received CPA scores of 88% in 2010, 68% in 2011 and 79% in 2012. Id. at 234:1-235:11. As a result of the three consecutive failing CPA scores, plaintiff's regional sales director, Christian Gosseaux ("Gosseaux"), issued a written warning to plaintiff on June 21, 2012. Id. at 235:12-236:6. The following year, in 2013, plaintiff raised his CPA score to 88%. Id. at 246:11-17.

On January 23, 2014, Gosseaux presented plaintiff with his 2014 PEP evaluation, on which plaintiff scored 287, and a Red Store Action Plan. Id. at 251:3-16. Gosseaux described the Red Store Action Plan as a coaching document used when GNC "identified a manager who needed to be put on a plan, . . . or who needed immediate improvement." Id. at 248:14-23. According to Gosseaux, the PEP score and Red Store Action Plan were given to plaintiff on the same day out of "convenience." Id. at 249:1-10. Gosseaux testified he had already been planning on putting plaintiff on the Red Store Action Plan and because he was in the store, he delivered plaintiff's PEP evaluation and the Red Store Action Plan on the same day. Id. at 249:1-17. Gosseaux further testified the Red Store

Action Plan was a "stand alone document," and it was not meant to coincide with the PEP. Id. at 251:3-16. The Red Store Action Plan allowed plaintiff 30 days to make improvements, while the PEP allowed 60-90 days to make improvements. Id. Plaintiff also contends the Red Store Action plan contained various ageist comments, including reference to plaintiff's "same old ways" and plaintiff needing to "grow" with the company. Id. at 251:3-16; 282:16-283:3.

Approximately one month after receiving the PEP and being placed on the Red Store Action Plan, plaintiff was terminated for, according to Gosseaux, failure to improve the performance of the store after being placed on the Red Store Action Plan. Id. at 254:13-19. Plaintiff was replaced by Nicholas Librizzi who was in his 20s. Id. at 278:1-3.

In order to show he was treated differently than other similarly situated individuals, plaintiff presented a grid listing the names, age and status of employment of six store managers in the same region as plaintiff with a PEP score below 300 from 2012 to 2015. See Trial Ex. P6(B). The grid indicates the six store managers listed were all younger than plaintiff by at least ten years and none of them were placed on the Red Store Action Plan or terminated within 30 days of receiving a failing PEP score. See id.

On November 19, 2014, plaintiff filed suit in state court, alleging wrongful termination based on age discrimination under the New Jersey Law Against Discrimination ("NJLAD"). On December 10, 2014, defendant removed this matter to federal court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332. See Notice of Removal [Doc. No. 1]. After fact discovery concluded, defendant moved for summary judgment arguing plaintiff could not maintain a claim of discrimination pursuant to the NJLAD because he was terminated for a legitimate non-discriminatory reason.[5] Def.'s Mot. for Summary Judgment, [Doc. No. 34]. The Court denied defendant's motion finding a genuine issue of material fact existed as to whether defendant's proffered reason for termination was pretext. See Andujar v. General Nutrition Corp, C.A. No. 14-7696(JS), 2017 WL 2323405 (D.N.J. May 26, 2017), [Doc. No. 40].

A jury trial was conducted on October 24, 25 and 26, 2017. The jury returned a verdict in favor of plaintiff in the amount of $123,926 in back pay, $60,000 in front pay and $75,000 in emotional

---

[5] "Age discrimination claims under the NJLAD are appropriately analyzed by examination of federal cases arising under Title VII and the ADEA." Abrams v. Lightolier, Inc., 841 F. Supp. 584, 596 (D.N.J. 1994) (citing Giammario v. Trenton Bd. of Educ., 203 N.J. Super. 356 (App. Div. 1985)). Thus, discrimination claims brought under the NJLAD are analyzed according to the burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Arenas v. L'Oreal United States Prods., Inc., 790 F. Supp. 2d 230, 235 (D.N.J. 2011); Fischer v. Allied Signal Corp., 974 F. Supp. 797, 805 (D.N.J. 1997).

distress damages. [Doc. No. 63]. Final judgment was entered on October 30, 2017. [Doc. No. 66]. Plaintiff timely filed the instant motion seeking judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) or a new trial pursuant to Fed. R. Civ. P. 59.

## Discussion

### A. Motion for Judgment as a Matter of Law

Under Fed. R. Civ. P. 50, a party may move "for judgment as a matter of law . . . at any time before the case is submitted to the jury," and the court may enter judgment if it finds a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." If the motion is not granted, it may be renewed "[n]o later than 28 days after the entry of judgment . . . and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). "The court may, on consideration of the renewed motion, enter judgment as a matter of law for the moving party, leave the jury's original verdict undisturbed, or order a new trial." Pediatrix Screening, Inc. v. TeleChem Int'l, Inc., 602 F.3d 541, 546 (3d Cir. 2010) (citing Fed. R. Civ. P. 50(b)).

The Court will only address issues raised in a Rule 50(b) motion which were first properly raised in a Rule 50(a) motion. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1172 (3d Cir. 1993) ("In order preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a

matter of law . . . pursuant to Rule 50(a), and specify the grounds for that motion.").

"Judgment as a matter of law is a sparingly invoked remedy." Marra v. Philadelphia Housing Auth., 497 F.3d 286, 300 (3d Cir. 2007) (internal citation and quotation marks omitted). Because the jury returned a verdict in favor of plaintiff, the Court "must examine the record in a light most favorable to the plaintiff, giving [him] the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn." In re Lemington Home for the Aged, 777 F.3d 620, 626 (3d Cir. 2015) (internal citation and quotation marks omitted). Judgment as of matter of law following return of a jury verdict is only appropriate "if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001) (internal citation and quotation marks omitted). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence from which the jury could properly find a verdict for that party." Jaasma v. Shell Oil Co., 412 F.3d 501, 503 (3d Cir. 2005) (internal citation and quotation marks omitted).

Here, defendant made a Rule 50(a) motion at the close of plaintiff's presentation of the evidence and again after its own presentation of the evidence. See Tr.2 at 219:7-220:16; 323:22-

324:11. In its Rule 50(a) motion at the close of plaintiff's case in chief, defendant argued the Court should enter judgment as a matter of law in its favor because plaintiff admitted during his testimony the reason he was fired was his poor performance and, if the Court declined to enter judgment on those grounds, it should enter judgment as a matter of law on the issue of front pay because plaintiff did not submit sufficient evidence to support an award of front pay. Id. at 219:7-220:16. In its Rule 50(a) motion at the close of its presentation of evidence, defendant argued the Court should enter judgment as a matter of law limiting damages because it was discovered during plaintiff's deposition that he lied on his resume, an offense for which an employee would be discharged and thus, damages should be limited to only the period prior to the testimony. Id. at 323:22-324:11. The Court denied both motions and the case was submitted to the jury. Id. at 224:13-225:16; 326:13-327:14. When considering plaintiff's present Rule 50(b) motion, the Court will only consider the issues defendant preserved.[6] See Lightning Lube, 4 F.3d at 1172. Thus, any arguments

---

[6] Defendant does not make clear in its motion on which grounds it moves for judgment as a matter of law pursuant to Rule 50(b) and on which grounds it moves for a new trial. As noted, when examining defendant's Rule 50(b) motion, the court will only consider the arguments properly preserved in a Rule 50(a) motion. Because defendant's motion for a new trial is made in the alternative and no pre-verdict motions are required, the Court will consider all arguments in the context of defendant's motion for a new trial.

raised in this motion not previously raised in the Rule 50(a) motion will only be considered in the context of defendant's motion for a new trial.

## B. Motion For a New Trial

Unlike a motion for judgment as a matter of law pursuant to Rule 50(b), a motion for a new trial pursuant to Rule 59 does not require any pre-verdict motions. After a jury trial, the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Court may grant a new trial "purely on a question of law" or to correct a previous ruling "on a matter that initially rested within the discretion of the court." Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993) (internal citation and quotation marks omitted).

The Court may also grant a new trial where it "believes the jury's decision is against the weight of the evidence." Id. at 1290. However, a Court should grant a motion for a new trial only when "the great weight of the evidence cuts against the verdict" and "a miscarriage of justice would result if the verdict were to stand." Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 386 (3d Cir. 2016) (quoting Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006)). The Court must not "substitute its judgment of the facts and the credibility of the witnesses for that of the jury." Id. (internal citation and quotation marks omitted).

9

Unlike Rule 50(b) motions, a motion for a new trial does not require any pre-verdict motions. Accordingly, when deciding defendant's motion for a new trial, the Court will consider all of defendant's arguments presented in this motion.

## C. Defendant's Motion for Judgment as a Matter of Law or a New Trial

Defendant moves for judgment as a matter of law or a new trial on the following grounds: 1) the Court erred in admitting the purported comparator evidence, 2) the Court erred in admitting Exhibit P4(A) into evidence, 3) the curative charge given after defendant's closing was in error and prejudiced defendant, 4) the damages award was not supported by the evidence, 5) empaneling Juror 8 was error, and 6) the verdict was against the weight of the evidence. For the reasons set forth below, all of defendant's arguments are rejected.

### 1. Comparator Evidence—Exhibit P6(B)

As noted above, plaintiff submitted evidence of six GNC managers within the same region around the time of plaintiff's dismissal who, like plaintiff, scored below 300 on the PEP evaluation. Trial Ex. P6(B). Notably, none of the managers was terminated within 30 days or placed on a Red Store Action Plan, a fact plaintiff used as evidence he was treated differently than other similarly situated employees.

Defendant contends the Court erred in admitting the proffered comparator evidence because none of the proffered comparators were similarly situated to plaintiff. Def.'s Br. at 11. Defendant also contends the inquiry into whether individuals are similarly situated is one for the Court, not the jury. Id. at 9.

Pretext for discrimination may be supported in a number of ways, including, as here, comparator evidence of similarly situated individuals. See Wilcher v. Postmaster Gen., 441 Fed. Appx. 879, 881 (3d Cir. 2011) (citing Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1988)). "'[T]here is no precise formula to determine whether an individual is similarly situated to comparators,' and it is generally a question of fact for the jury." Simmermon v. Gabbianelli, 932 F. Supp. 2d 626, 633 (D.N.J. 2013) (quoting Fiala v. Bogdanovic, C.A. No. 07-2041, 2009 WL 3260585, *4 (M.D. Pa. Oct. 8, 2009)).

Notably, "similarly situated does not mean identically situated." Opsatnik v. Norfolk Southern Corp., 335 Fed. Appx. 220, 223 (3d Cir. 2009). A determination whether an individual is similarly situated to the plaintiff takes into account several factors, including job function, level of supervisory responsibility, salary and the nature of the misconduct engaged in. Wilcher, 441 Fed. Appx. at 882; Ewell, 94 F. Supp. 3d at 625.

Here, plaintiff presented evidence of managers in the same region as plaintiff (Region 22) for the period of 2012 to 2015 who, like plaintiff, scored below 300 on their evaluations. Given that all of these individuals were managers, the jury could infer they had the same or similar job functions and the same level of supervisory responsibilities as plaintiff. Defendant did not contest this point. Further, the act that allegedly resulted in plaintiff's termination was his poor job performance and all of the managers submitted as comparators received a failing score (below 300) on their PEP evaluations, just as plaintiff. Accordingly, the jury (and the Court) could find the comparators were "similarly situated to plaintiff in all relevant respects."[7]

Defendant argues Wilcher v. Postmaster Gen., 441 Fed. Appx. 879, 882 (3d. Cir. 2011) and Ewell v. NBA Props., 94 F. Supp. 3d 612, 625 (D.N.J. 2015) support the proposition that the comparators were not similarly situated to plaintiff, and thus, Exhibit P6(B) should not have been submitted to the jury. Def.'s Br. at 11. However, these cases are distinguishable.

In Wilcher, the Third Circuit examined a District Court's entry of summary judgment in favor of the defendant-employer. 441

---

[7] Defendant does not dispute the fact that it had a full and fair opportunity to argue the store managers listed on Exhibit P6(B) were not appropriate comparators. Nor does defendant dispute the fact it engaged in extensive direct and cross-examination on this topic.

Fed. Appx. at 879. The Court determined the evidence plaintiff submitted to show pretext for discrimination was not sufficient to present a question of fact for the jury. Id. at 882-83. The Court ruled the seven employees the plaintiff offered as comparators were not similarly situated because they held different positions, had different job responsibilities and were subjected to disciplinary action for different types of misconduct than the plaintiff. Id. Here, unlike Wilcher, all of the comparators were managers within the same region as plaintiff and had the same or similar job responsibilities. In further contrast to Wilcher, all of the comparators in this case were similar in that they all had PEP scores under 300. The fact that the comparators were not identical to plaintiff in every respect does not disqualify them.

In Ewell, the Court granted summary judgment in favor of the defendant-employer, finding the plaintiff did not present sufficient evidence to show pretext for discrimination. 94 F. Supp. 3d at 625. The plaintiff presented evidence of three comparators, who he claimed engaged in conduct similar to the conduct for which he was discharged. Id. However, the Court disagreed, finding the proffered comparators had engaged in conduct dissimilar to the conduct for which the plaintiff was discharged. Id. at 631.

Here, as noted above, the proffered reason for plaintiff's discharge was his poor job performance. All of the managers proffered as comparators scored below 300 on the PEP, just as

13

plaintiff had. Thus, unlike in Ewell where all of the proposed comparators engaged in different types of misconduct, the jury could find all of the proposed comparators engaged in the same type of "misconduct" as plaintiff—they all scored below 300 on the PEP.

Defendant argues the question whether the proffered comparators are similarly situated should be decided by the Court, not the jury. Def.'s Br. at 9.[8] Thus, defendant contends, the Court's statement that the question was one for the jury was error. Id. Defendant's contention is unsupported. The question whether proffered comparators are similarly situated to plaintiff is generally a question of fact left for the jury. See Simmermon, 932 F. Supp. 2d at 633 (stating the question whether proffered comparators are similarly situated to plaintiff "is generally a question of fact for the jury"); see also Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 497-98 (App. Div. 1994) (finding no error occurred when trial court left the question of whether plaintiff was similarly situated to other employees to the jury).

In support of its argument, defendant cites Wilcher, Ewell and McCullers v. Napolitano, 427 Fed. Appx. 190, 195 (3d Cir.

---

[8] It should be obvious the Court does not find that the plaintiff and comparators are so different that Exhibit P6(B) should not have been admitted into evidence.

14

2011). However, none of these cases supports defendant's proposition. First, none of the cases explicitly states the question of whether comparators are similarly situated is for the Court, not the jury. It is true the courts in Wilcher, Ewell and McCullers examined whether the proffered comparators were similarly situated. However, the examination was made in order to assess whether plaintiff presented sufficient evidence of pretext to survive a motion for summary judgment. It is proper for a court to exclude comparator evidence where it is clear no reasonable jury could find the similarly situated requirement has been met. Simmermon, 932 F. Supp. 2d at 633, (citing McDonald v. Vill. of Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004)). Accordingly, in making such a determination, a court must necessarily examine whether the proffered comparators are similarly situated to plaintiff. Thus, the courts in Wilcher, Ewell and McCullers necessarily examined whether the comparators were similarly situated in order to assess whether plaintiff had presented sufficient evidence of pretext to overcome summary judgment.

Here, unlike in Wilcher, Ewell and McCullers, the question whether plaintiff met his burden of showing pretext was properly left to the jury.[9] Thus, the Court did not err in admitting the

---

[9] The Court also did not address the question of whether the proffered comparators were similarly situated at the summary judgment phase. Notably, defendant did not raise the issue at the summary judgment phase, despite the fact plaintiff used Exhibit

evidence of the proffered comparators to the jury and a new trial is not warranted.[10]

### 2. Exhibit P4(A)

At trial, plaintiff sought to admit into evidence defendant's response to plaintiff's discovery request for "[c]opies of all manager evaluations in Region 22 for the years 2012-2014 with scores of less than 300, including copies of any 'plans' such managers were put on." See Trial Ex. P4(A). Defendant responded to the document request with general objections, but also produced evaluations for Diodell Wright, Jeremy Byrnes, John O'Neill, Kevin Bowes, Kyle Pauley, and Pete Sirolli, the individuals plaintiff presented as comparators. Id. Plaintiff sought to admit this document in order to provide a foundation to the jury as to the origin of the information on the proffered comparators presented on the grid (Exhibit P6(B)) at trial, and more specifically, to show the information "came from GNC." Tr.2 at 186:19-20. The Court admitted the exhibit into evidence over defendant's objection.

Defendant objected to Exhibit P4(A) at trial because the document was not listed as an exhibit in the Final Pretrial Order

---

P6(B) to support his opposition to defendant's motion. See Def.'s Summary Judgment Mot. [Doc. No. 34]; Pl.'s Br. Opp'n to Summary Judgment [Doc. No. 36]; Def.'s Reply Br. [Doc. No. 35].

[10] Defendant did not raise this issue during either of his Rule 50(a) motions, thus, the issue was not properly preserved. Accordingly, the Court considered this issue only in the context of defendant's motion for a new trial.

("FPTO"). Id. at 188:20-25. Because the document was not included in the FPTO, the Court conducted a manifest injustice inquiry and, over defendant's objection, admitted the evidence. Id. at 189:2-190-5. Defendant contends the Court erred in admitting P4(A) because plaintiff did not allege, and the Court did not inquire into, any manifest injustice plaintiff would suffer if the evidence was not admitted into evidence. Def.'s Br. at 14.

A motion to amend a final pretrial order is governed by Fed. R. Civ. P. 16. The decision whether to permit amendment to a final pretrial order "ultimately rests within the court's discretion." Krys v. Aaron, 312 F.R.D. 373, 377 (D.N.J. 2015) (citing Joy Mfg. Co. v. Sola Basic Indus., Inc., 697 F.2d 104, 109 (3d Cir. 1982); Analytical Measurements v. Keuffel & Esser Co., 843 F. Supp. 920, 926 n. 4 (D.N.J. 1993)). While it is within the Court's discretion, the Rule provides that a final pretrial order shall be modified "only to prevent manifest injustice." Scopia Mortg. Corp. v. Greentree Mortg., Co., L.P., 184 F.R.D. 526, 528 (D.N.J. 1998) (quoting Fed. R. Civ. P. 16(e)).

In making a manifest injustice inquiry, the Court considers: (1) the prejudice or surprise to the nonmoving party; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule would disrupt the orderly and efficient trial of the case; (4) the bad faith or willfulness on the part of the movant; (5) the importance of the evidence and; (6) whether

the decision to amend to include new evidence is a matter of new strategy or tactic. Id. at 528.

Here, the Court heard argument on defendant's objection and conducted the appropriate manifest injustice inquiry before admitting Exhibit P4(A). Tr.2 at 185:18-190:5. The Court first acknowledged manifest injustice "is a very high standard." Id. at 189:2-6. In conducting a manifest injustice inquiry, the Court determined: 1) the document was not a surprise to defendant because defendant authored the document; 2) exclusion of the document from the FPTO "was an inadvertent oversight" by plaintiff; 3) the document gave insight into a key issue in the case; 4) admission of the document would not prejudice defendant; and 5) any possible prejudice could be cured through questioning Gosseaux on the issue. Id. at 189:2-190-5. Thus, defendant's objection was overruled and Exhibit P4(A) was admitted.

Defendant contends the Court used the incorrect standard when examining whether to admit P4(A) into evidence, leading to the document being erroneously admitted. Def.'s Br. at 14. Specifically, defendant contends the Court erroneously examined the prejudice to defendant that would result if the evidence was admitted, when the requisite inquiry was whether it would be a manifest injustice to plaintiff if the evidence was not admitted. Id.

Defendant is wrong. It is true the Court examined the potential prejudice to defendant if the evidence was admitted, however, it did so in the context of the manifest injustice inquiry. Potential prejudice to the nonmoving party is the first factor to be considered in making a manifest injustice inquiry as articulated in Scopia Mortgage, 184 F.R.D. at 528. Prejudice to defendant was only part of the Court's inquiry. The Court went on to examine the other factors articulated in Scopia Mortgage. The Court examined defendant's ability to cure any prejudice, determining it could do so by questioning Gosseaux. The Court also examined the importance of the evidence, finding the evidence was probative and was directed to a key issue in the case. Last, the Court inquired into whether there was bad faith or willfulness on the part of plaintiff, finding the omission of the document from the FPTO was "an inadvertent oversight." Thus, the Court made the requisite manifest injustice inquiry and exercised its discretion to decide Exhibit P4(A) should be admitted into evidence.

Defendant also contends it was inherently prejudicial to admit the evidence because it permitted plaintiff to argue GNC conceded the comparators were similarly situated. Def.'s Br. at 15. Defendant contends had it known the Court would permit introduction of the exhibit, "it could have, and would have, prepared additional exhibits in response." Id. at 16-17. However, admission of Exhibit P4(A) did not present any new evidence of

which defendant had no warning. Defendant was aware plaintiff sought to use the comparator evidence at trial as the grid (Exhibit P6(B)) containing the evidence and the evaluations of the other managers in the region was included in the FPTO. Further, defendant fails to articulate what additional exhibits it would have used had it known Exhibit P4(A) was going to be examined. Therefore, the Court gives no weight to defendant's argument that it would have acted differently. In addition, defendant examined Gosseaux on the issue of the alleged comparators, allowing defendant to counter any argument that GNC conceded the comparators were similarly situated. Thus, the Court's admission of P4(A) into evidence was not error warranting a new trial.[11]

### 3. The Curative Instruction on Defendant's Closing Argument

While on the stand, plaintiff admitted he had been convicted of a crime and failed to disclose that fact on his application for employment with defendant. Tr.1 at 162:2-163:11. During closing arguments, defense counsel referred to plaintiff as a "felon." Tr.3 at 354:13-16.[12] After defense counsel's closing argument, plaintiff's counsel requested a curative instruction on the ground

---

[11] Defendant did not raise this issue during either of his Rule 50(a) motions, thus, the issue was not properly preserved for the purpose of defendant's Rule 50(b) motion. Accordingly, the Court considered this issue only in the context of defendant's motion for a new trial.

[12] Tr.3 refers to trial proceedings held on October 26, 2017. [Doc. No 71].

there was no evidence plaintiff committed a felony and the statement was highly prejudicial. Id. at 355:17-356:6. The Court agreed and issued a curative instruction. Id. at 367:13-368:6. Defendant now contends the curative instruction had a prejudicial effect on defendant because it was belittling to defense counsel and "eviscerated one of the key defense positions on the relative credibility of the parties." Def.'s Br. at 18.

When there is a misstatement in closing argument and it is brought to the attention of the trial judge, a curative instruction addressing the misstatement is an appropriate remedy. See Vandenbraak v. Alfieri, 209 Fed. Appx. 185, 190 (3d Cir. 2006) (citing Edwards v. City of Phila., 860 F.2d 568, 575 (3d Cir. 1988)) (a curative instruction can "sufficiently negate[] any prejudice that might . . . result[] from . . . counsel's errant arguments to the jury."). Further, "[a] federal judge is permitted to summarize and comment upon the evidence." American Home Assurance Co. v. Sunshine Supermarket, Inc., 753 F.2d 321, 327 (3d Cir. 1985). However, the Court's statements "may not confuse or mislead the jury, or become so one-sided as to assume an advocate's position." Id. (citing McGlothan v. Pennsylvania Ry. Co., 170 F.2d 121, 125 (3d Cir. 1948); United States v. Allied Stevedoring Corp., 241 F.2d 925, 934 (2d Cir.)). Thus, in order to be entitled to a new trial on this issue, defendant must demonstrate the

court's comments became so one-sided as to become advocacy for plaintiff. American Home Assurance, 753 F.2d at 327.

In closing remarks, defense counsel stated:

> You know, when the stakes are high, when somebody has something significant at stake, you really tell the mark of a person. Do they tell the truth or do they kind of hide the truth and lie about it? You know, Mr. Andujar was candid. He said the reason why I (plaintiff) lied on my application was because I (plaintiff) wanted to get the job. **I didn't think they'd hire me if I revealed that I (plaintiff) was a felon**. You know, lying to get a job or lying to win a case, there is no difference in that.

Tr.3 at 355:10-17 (emphasis supplied).

After defendant completed his closing arguments, plaintiff requested a curative instruction be given to the jury, arguing there was no evidence in the record supporting defense counsel's statement that plaintiff was a felon and the statement was "incredibly prejudicial." Id. at 365:17-366:6. The Court agreed and issued the following curative instruction:

> Members of the jury, you have been told and you will be told that the arguments of counsel are not evidence, that the evidence in this case is what you heard from the witnesses, the exhibits that are in evidence, the deposition testimony, the interrogatory answers. The argument of counsel in closing argument is not evidence.
>
> You heard defense counsel refer to plaintiff as a felon in his closing argument. I instruct you that there is absolutely no evidence in the record to support that fact. I ask you to disregard that argument when you go to deliberate. That was a misstatement. It did not correctly characterize the evidence in the case. And the Court does not want that statement to prejudice your deliberations, and that's why I'm giving you this curative instruction.

> You heard the evidence. You judge for yourself what the
> facts are. But I'm instructing you that there are no
> facts in the record, no facts in this trial, to support
> the statement that I referred to that defense counsel
> made in his closing argument.

Id. at 367:13-368:6.

The Court's instruction did not reach the level of advocacy on behalf of plaintiff, and thus, a new trial is not warranted. A curative instruction was an appropriate remedy here because defense counsel's misstatement referring to plaintiff as a felon had no basis in the evidence and had the potential to prejudice or mislead the jury. Plaintiff never testified he committed a felony and no evidence was put forth suggesting he committed a felony. Accordingly, a curative instruction was appropriate to negate any prejudice that might have resulted from defendant's misstatement.

Defendant's contention that the curative instruction given by the Court prejudiced the jury warranting a new trial is not supported by the record. The Court's instruction appropriately informed the jury that closing statements are not evidence and there was no evidence in the record indicating plaintiff committed a felony. The Court then instructed the jury to disregard the statement, characterizing defense counsel's argument as a "misstatement." The Court did not take a position of advocacy, but merely informed the jury of the evidence on which it was to rely. Furthermore, the Court did not, as defendant contends, admonish

defense counsel. In fact, the Court referred to counsel's statement as a "misstatement" and did not disparage defense counsel.

Defendant's assertion that the curative instruction "completely disregarded the admission of guilt by the plaintiff" and "painted counsel as a liar" is unfounded. The Court issued an instruction specifically directed to defense counsel's reference to plaintiff as a "felon." The Court made no comment to the jury that would imply they should disregard plaintiff's admission that he lied on his job application when asked if he had ever committed a crime. In fact, the Court reminded the jury that it heard the evidence and should judge for itself what the facts are. Further, the Court referred to counsel's statement as merely a "misstatement." The Court made no reference disparaging defense counsel. Thus, the Court did not make any statement that could be construed as characterizing defense counsel as a liar. Defendant's contention that the curative instruction had a "belittling effect on counsel and eviscerated one of the key defense positions" and "painted defense counsel as a liar" is not supported by the record. Accordingly, a new trial is not warranted on this ground.[13]

---

[13] Defendant did not raise this argument in a Rule 50(a) motion. Thus, the issue was not preserved for the purpose of a Rule 50(b) motion. Accordingly, the Court considered this issue only in the context of defendant's motion for a new trial.

### 4. Damages

#### a. Back Pay and Front Pay

Defendant contends plaintiff failed to present sufficient evidence demonstrating mitigation of back pay damages or to support the award of front pay damages. Def.'s Br. at 23. Specifically, defendant contends, "the record firmly established that plaintiff did not make reasonable efforts to find employment." Id. at 24. Defendant also contends the record is lacking in specificity with regard to the terms of any subsequent employment, and thus, "it would be impossible for the jury to determine a calculation of damages for front pay." Id. at 25.

Back pay, front pay and emotional distress damages are recoverable under the NJLAD. Goodman v. London Metals Exchange, 86 N.J. 19, 34 (1981) (back pay is an available remedy under the NJLAD); Strenkoski v. Apex Chem. Inc., C.A. No. 13-2201(WJM), 2014 U.S. Dist. LEXIS 116133, *3 (D.N.J. June 9, 2014) ("Under the NJLAD, a victim of discrimination can recover emotional damages, as well as front pay."). Back pay "is intended to eliminate all effects of discriminatory employment practices and make the victims whole." Weiss v. Parker Hannifan Corp., 747 F. Supp. 1118, 1132 (D.N.J. 1990) (citing Rios v. Enterprise Ass'n Steamfitters Local 638 of U.A., 501 F.2d 622, 629 (2d Cir. 1974); Robinson v. City of Lake Station, 630 F. Supp. 1052, 1062 (N.D. Ind. 1986)). In order to calculate an appropriate back pay amount, a comparison

must be made examining plaintiff's actual earnings between the time of discharge and the close of trial and what he would have earned were he not discharged. Id. at 1132 (citing Horn v. Duke Homes, 755 F.2d 599, 606 (7th Cir. 1985)). An award of back pay should also include benefits plaintiff would have received absent the discrimination. Id. (citing Crabtree v. Baptist Hospital of Gadsden, Inc., 749 F.2d 1501, 1502 (11th Cir. 1985); Whatley v. Skaggs Companies, Inc., 707 F.2d 1129, 1140 (10th Cir.); Pedreyra v. Cornell Prescription Pharmacies, Inc., 465 F. Supp. 936, 951 (D.Colo. 1979)).

Front pay may also be awarded "in lieu of reinstatement when plaintiff's return to the work place would cause disharmony and acrimony." Id. (citing Goss v. Exxon Office Systems Co., 747 F.2d 885, 890 (3d Cir. 1984)). "Front pay is a concept that attempts to project and measure the ongoing economic harm, continuing after the final day of trial, that may be experienced by a plaintiff who has been wrongfully discharged in violation of anti-discrimination laws." Strenkoski, 2014 U.S. Dist. LEXIS 116133, *3-4 (citing Quinlan v. Curtiss-Wright Corp., 425 N.J. Super. 335, 350 (App. Div. 2012)). There are several factors to consider when determining front pay, including: 1) plaintiff's potential future in the position from which he was terminated; 2) his work and life expectancy; 3) his obligation to mitigate damages; 4) the availability of comparable employment opportunities and the time

reasonably required to find substitute employment. Quinlan, 425 N.J. Super. at 350.

The jury returned a verdict in favor of plaintiff, awarding $123,926 in back pay, $60,000 in front pay and $75,000 in emotional distress damages. [Doc. No. 63]. In order to support an award for back pay, plaintiff was required to put forth evidence of what he made between the time of discharge and the close of trial and what he would have earned in that time were he not discharged. Weiss, 747 F.Supp. at 1132. At trial, plaintiff testified when he started his current position he was paid $12.50 an hour, after 90 days he received a raise and, at the time of trial, was making $15 an hour. Tr.1 at 141:24-142:4. Plaintiff also produced evidence he made $34,725.99 in 2013, his final year with GNC. Id. at 114:13-17. Plaintiff also outlined the various benefits he received at GNC, which should be part of a back pay award. Weiss, 747 F.Supp. at 1132. Plaintiff testified he received a "merit raise" every year for his sales, GNC contributed to his 401(k), he received three weeks of vacation time "for being with the company for so long," and he received life insurance through the company. Tr.1 at 117:2-12. Thus, plaintiff provided sufficient evidence from which a jury could determine an appropriate back pay award.

Plaintiff also presented evidence on all of the factors to be considered when examining an award of front pay. See Quinlan, 425 N.J. Super. at 350 (factors to consider when determining front

pay: 1) plaintiff's potential future in the position from which he was terminated; 2) his work and life expectancy; 3) his obligation to mitigate damages; and 4) the availability of comparable employment opportunities and the time reasonably required to find substitute employment). Plaintiff presented evidence from which the jury could determine plaintiff was dedicated to GNC and would have remained employed there for the foreseeable future. Plaintiff stated he was known in the community as the "GNC man," he missed working with the customers and he "lived, ate, slept GNC." Tr.1 at 141:1-11. Plaintiff also testified about his job search after his termination from GNC, his inability to find comparable employment and his current position where he was making $15 an hour. Plaintiff testified at that rate, he would make approximately $31,000 annually, which would still be short of what he was making at GNC in his final year. Id. at 141:24-142:4. Plaintiff testified in order to find work he "went online" and to various retail stores in the area, including CVS, RiteAid, and Walmart to no avail. Id. at 112:14-16. Plaintiff also testified he went to a temporary service and "took on any menial job, just to keep my income coming in." Id. at 112:21-24. Thus, contrary to defendant's contention, plaintiff presented sufficient evidence to support the jury's award of front pay damages.

Defendant contends the evidence presented does not support the award of front pay because plaintiff failed to present specific

evidence with regard to the terms of his subsequent employment, such as when he started the position or how much he earned. Def.'s Br. at 25. Front pay is intended to be awarded "in lieu of reinstatement." _Weiss_, 747 F.Supp. at 1135. It is intended to compensate plaintiffs for any ongoing economic harm that may continue after the final day of trial. _Strenkoski_, 2014 U.S. Dist. LEXIS 116133, *3. Given the nature of front pay, plaintiff presented sufficient evidence on which the jury could rely to award front pay damages. Because front pay is intended to compensate plaintiff for any economic harm continuing beyond the close of trial, the jury was presented with evidence of how much plaintiff was to make beyond the close of trial, as well as evidence that his salary was still lower than it would have been were he still employed by defendant. As noted above, plaintiff presented evidence on all of the factors to be considered when awarding front pay. _See_ _Quinlan_, 425 N.J. Super. at 350 (listing factors to consider when determining front pay).

Defendant also contends the evidence submitted at trial does not support the jury's damage award because the record established plaintiff did not make reasonable efforts to find comparable employment. Def.'s Br. at 24. A plaintiff has a duty to mitigate his/her damages "by seeking suitable employment with reasonable diligence." _Ford Motor Co. v. EEOC_, 458 U.S. 219, 231, 73 L. Ed. 2d 721, 102 S. Ct. 3057 (1982); _Goodman v. London Metals Exchange,_

Inc., 86 N.J. 19, 34-36 (1981). Failure to mitigate is an affirmative defense under the NJLAD. Goodman, 86 N.J. at 40. Because failure to mitigate is an affirmative defense, the burden of proof is on defendant and that burden may be met in one of two ways: 1) defendant may show plaintiff refused an offer from the employer of a job that was substantially equivalent to plaintiff's former position, or 2) defendant may show other substantially equivalent positions were available and plaintiff failed to use reasonable diligence in attempting to secure such a position. Anastasio v. Schering Corp., 838 F.2d 701, 708 (3d Cir. 1988). However, a plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position" in order to mitigate his damages. Ford Motor Co., 458 U.S. at 231.

Specifically, defendant contends plaintiff failed to present sufficient evidence demonstrating mitigation of back pay damages or to support the award of front pay damages. Def.'s Br. at 23. Further, defendant contends comparable employment was available to plaintiff as Gosseaux testified plaintiff could have returned to GNC in a sales position but plaintiff refused. Tr.2 at 238:5-22. Defendant's contention that plaintiff failed to present sufficient evidence demonstrating mitigation is misplaced. While plaintiff is required to mitigate his damages, it is not plaintiff's burden to prove at trial he mitigated. Because failure to mitigate is an

affirmative defense under the NJLAD, the burden is on defendant to show plaintiff failed to mitigate his damages.

In an effort to show plaintiff failed to mitigate his damages, GNC presented evidence plaintiff was offered a position in sales with GNC that he did not ultimately take. Id. at 254:24-255:12. However, as noted above, plaintiff need not take a lesser position in an effort to mitigate his damages. Ford Motor Co., 458 U.S. at 231. Ultimately, the question whether a sales associate position was a comparable position to plaintiff's position as manager, or whether it was a lesser position, was appropriately left to the jury. See Booker v. Taylor Milk Co., 64 F.3d 860, 864 (3d Cir. 1995) ("Whether or not a claimant has met his duty to mitigate damages is a determination of fact.").

Further, plaintiff presented evidence to demonstrate he attempted to mitigate his damages. Plaintiff testified to his job search after he was discharged. Plaintiff also testified in order to find work he "went online" and to various retail stores in the area, including CVS, RiteAid and Walmart. Tr.1 at 112:14-16. In addition, plaintiff testified he went to a temporary service and "took on any menial job, just to keep my income coming in." Id. at 112:21-24. Plaintiff's wife testified plaintiff even took a job holding a sign on a street corner. Tr.2 at 213:12-212. The jury was presented with evidence from both plaintiff and defendant regarding mitigation. The question whether plaintiff sufficiently

mitigated or attempted to mitigate his damages was a question of fact left for the jury. Defendant acknowledges the jury was properly instructed on plaintiff's duty to mitigate. Tr.3 at 392:21-395:23. Thus, defendant's contention that the jury award should be upset because plaintiff failed to mitigate is not supported by the record.

As discussed above, there is sufficient evidence in the record to support the jury's front pay and back pay award and a new trial on damages is not warranted. Defendant raised the front pay issue in his Rule 50(a) motion at the close of plaintiff's case in chief, arguing, as he does in this motion, the evidence presented did not support an award of front pay. Tr.2 at 220:6-15. Because defendant raised this issue in his Rule 50(a) motion, the issue was preserved for the purpose of a Rule 50(b) motion. However, for the reasons set forth above, judgment as a matter of law and a new trial on the issue of front pay is not warranted.

### b. Wrongdoing Leading to Termination

As noted above, plaintiff admitted at trial he lied on his employment application when he indicated he had never been convicted of a crime. Tr.1 at 162:9-163:18. Defendant contends plaintiff is not entitled to front pay damages and his back pay damages should be reduced because once GNC learned plaintiff lied on his application, GNC would have terminated plaintiff. Def.'s Br. at 26.

If evidence of employee wrongdoing is discovered during the course of an employment discrimination suit, an employer may be able to eliminate or reduce back pay and front pay damages if the employer can demonstrate the employee would have been terminated as soon as the withheld information was discovered. Cicchetti v. Morris Cty. Sheriff's Office, 194 N.J. 563, 567 (2008). In such a case, damages should only be awarded for the time period between the plaintiff's discharge and the date on which the defendant discovered plaintiff's wrongdoing that would have led to the plaintiff's discharge. McKennon v. Nashville Banner Publ. Co., 513 U.S. 352, 362, 115 S. Ct. 879, 886, 130 L. Ed. 2d 852, 864 (1995). However, defendant bears the burden of proving it would have terminated plaintiff as soon as it learned of plaintiff's wrongdoing. Cicchetti, 194 N.J. at 590.

Defendant contends it would have discharged plaintiff upon learning he falsified his employment application, a fact it learned during plaintiff's deposition on April 13, 2016. Def.'s Br. at 26. Accordingly, defendant seeks a reduction in front pay and back pay damages, arguing plaintiff is only entitled to damages from the date of discharge to April 13, 2016. However, the Court rejects defendant's argument because defendant failed to meet its burden of proving it would have discharged plaintiff upon learning he falsified his job application.

In order to support its position, defendant introduced into evidence its "Retail Operations Manual," which establishes a company policy requiring immediate discharge of any employee who falsifies a company required record. See Trial Ex. 3 ("Operations Manual"); Tr.2 at 323:23-324:11. The operations manual states that an employee will be discharged for his/her first offense of "falsification of any company required records." Standing alone, however, this evidence is insufficient to establish defendant would have discharged plaintiff upon discovering he falsified his job application. While GNC produced a manual stating falsification of company required records is an offense for which an employee would be discharged, it failed to produce any evidence that a job application is considered a "company required record." A "company required record" could be interpreted to be a record required to be kept as part of an employee's job functions, which would not likely include an application for employment. There was no testimony by Gosseaux or any other GNC employee, such as a representative of human resources, indicating a job application would be considered a "company required record." Further, "falsification" could indicate altering or changing a GNC document, not omitting information on an employment application. There was also no testimony from Gosseaux or any other GNC employee that plaintiff would have been fired for failing to reveal a past transgression.

Simply put, no evidence was presented at trial that defendant would have fired plaintiff upon discovering he falsified his job application. What the term "company required record" means is not entirely clear. Without testimony from a GNC official indicating the term encompasses job applications or testimony that plaintiff would have been immediately discharged upon discovering that he made a false statement on his job application, standing alone the manual is insufficient to support defendant's contention. Accordingly, defendant did not meet its burden of showing it would have discharged plaintiff upon discovering he falsified his job application.

Plaintiff raised this issue in his Rule 50(a) motion at the close of its case in chief, arguing, as he does here, the Court should enter judgment as a matter of law on the issue of damages after April 13, 2016, the date defendant discovered plaintiff falsified his job application. Tr.2 at 323:22-324:7. Accordingly, the issue was properly preserved for the purpose of the Rule 50(b) motion. However, for the reasons set forth above, judgment as a matter of law and for a new trial on this issue is not warranted.

### c. Emotional Distress

Defendant contends plaintiff failed to present sufficient evidence to demonstrate emotional distress damages. Def.'s Br. at 29. As noted above, emotional distress damages are available under the NJLAD. See Rendine v. pantzer, 141 N.J. 292, 312-13 (1995).

"[T]he general principle that trial courts should not interfere with jury-damage awards unless so disproportionate to the injury as to shock the conscience applies with equal force to awards of emotional distress damages in [NJ]LAD cases." Id. The $75,000 award for emotional distress damages here does not shock the conscience. The award is supported by the evidence, is within the "acceptable broad range" of emotional distress damage awards, and is proportional to plaintiff's injury.

Plaintiff and his wife testified to plaintiff's emotional distress after he was discharged from his position. Plaintiff testified he was "traumatized" after he was discharged, and he was so depressed he had to see a doctor and was placed on medications. Tr.1 at 112:8-13; 164:19. Plaintiff also testified to his dedication to the company, stating he was known in the community as the "GNC man," he missed working with the customers, and he "lived, ate, slept GNC." Id. at 141:1-11.

Plaintiff's wife testified plaintiff was "broken" and "confused" after he was discharged and he "never really recovered." Tr.2 at 212:13-17. She testified plaintiff became withdrawn, quiet, anxious, easily agitated, less affectionate and stopped going to family functions. Id. at 212:18-25.

This testimony is sufficient to support the $75,000 award for emotional distress, particularly under the NJLAD where embarrassment, humiliation or short periods of depression are

sufficient to support a claim of emotional distress. See <u>Klawitter</u> <u>v. City of Trenton</u>, 395 N.J. Super. 302, 335-36 (App. Div. 2007) (humiliation and embarrassment sufficient to support a claim of emotional distress); <u>Linton v. L'Oreal USA</u>, C.A. No. 06-5080, 2009 WL 838766, *26 (D.N.J. Mar. 27, 2009) (denying defendant's motion for summary judgment on plaintiff's claim for emotional distress damages where plaintiff alleged a "short period of depression").

Further, the evidence plaintiff presented is similar to the type of evidence considered sufficient to support a claim of emotional distress. See <u>Boles v. Wal-Mart Stores, Inc.</u>, C.A. No. 12-1762(MCA), 2015 WL 4653233, *8-9 (D.N.J. Aug. 5, 2015) (finding "plaintiff presented ample evidence at trial to support his claim of emotional distress, including: (1) the testimony of Plaintiff and his ex-wife regarding Plaintiff's emotional state following his termination; (2) Plaintiff's many years of service as an employee of Defendant; (3) Plaintiff's two employee of the year awards; (4) Plaintiff's willingness to move to and from Florida to advance within the company; and (5) both Plaintiff's and his ex-wife's statements that '[Wal-Mart] was [Plaintiff's] life.'"). It is also not insignificant that defendant did not introduce evidence challenging plaintiff's emotional distress claim.

In assessing whether an award for emotional distress damages is excessive, the Court may look to similar cases, but must also be "mindful that each verdict revolves around a unique set of facts

and circumstances." Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1229 (3d Cir. 1989); Hurley v. Atl. City Police Dep't, 933 F. Supp. 396, 423-25 (D.N.J. 1996) aff'd, 174 F.3d 95 (3d Cir. 1999). In cases of workplace discrimination under the NJLAD, "jurors are asked to exercise a high degree of discernment, through their collective judgment, to determine the proper measure of damages for emotional distress." Cuevas v. Wentworth Group, 226 N.J. 480, 500 (2016). Given the nature of such an analysis, "no two juries likely will award the same damages for emotional distress in a discrimination case," and "a permissible award may fall within a wide spectrum of acceptable outcomes." Id. Accordingly, only an award well outside of that "acceptable broad range" will be considered so excessive as to "shock the conscience." Id.

Bearing this framework in mind, the Court examines jury awards of emotional distress damages in other cases only in an effort to discern whether the award here falls outside the "acceptable broad range." In reviewing comparative awards, the Court finds the jury award of $75,000 in emotional distress damages does not fall outside the acceptable broad range, and thus, does not shock the conscience. See Ridley v. Costco Wholesale Corp., 217 Fed. App'x 130, 136-37 (3d Cir. 2007) (affirming $200,000 emotional distress damages award in a Title VII case based on testimony of plaintiff and spouse that discrimination caused plaintiff to have difficulty

sleeping, weight loss, social withdrawal and loss of self-esteem);
Klawitter, 395 N.J. Super. at 323 (affirming an award of $79,538
in emotional distress damages in an NJLAD case where plaintiff
testified to feeling "crushed and was devastated"); Hall v. Pa.
Dep't of Corrections, C.A. No. 02-1255, 2006 WL 2772551, *20-23
(M.D. Pa. Sept. 25, 2006) ($75,000 adequate to compensate plaintiff
for emotional damages in employment discrimination case where sole
damage evidence was plaintiff's testimony); O'Neill v. Sears,
Roebuck & Co., 108 F. Supp. 2d 433, 441-42 (E.D. Pa. 2000) (denying
motion for remittitur of $175,000 compensatory damages award in
ADEA case); Hurley, 933 F. Supp. at 424 (finding $175,000 in
emotional distress damages an appropriate award in Title VII and
NJLAD case even where testimony indicated that many of plaintiff's
emotional problems preceded the harassment at issue); Rendine v.
Pantzer, 276 N.J. Super. 398, 440 (App. Div. 1994) (affirming an
emotional distress award of $125,000 in an NJLAD case where
"plaintiffs described in detail their inconvenience and economic
loss, physical and emotional stress, anxiety in searching for
reemployment, uncertainty, career and family disruption and other
adjustment problems."), aff'd, 138 N.J. 272 (1994).

    As outlined above, plaintiff produced sufficient evidence to
support the jury's award of $75,000 in emotional distress damages.
The award does not shock the conscience as it is supported by the
evidence, proportional to plaintiff's injury and does not fall

outside the acceptable broad range of awards. Thus, a new trial on emotional distress damages is not justified.[14]

### 5. Juror 8

During voir dire juror 8 indicated two previous incidents would affect her ability to render an impartial verdict. Tr.1 at 70:14-72:5. After additional questioning and discussion with counsel, the Court declined to strike Juror 8 for cause. Id. at 70:14-72:24. Defendant now contends the Court's refusal to strike Juror 8 for cause constitutes reversible error warranting a new trial. Def.'s Br. at 35.

"[D]istrict courts have been awarded ample discretion in determining how best to conduct the voir dire." Kirk v. Raymark Indus., Inc., 61 F.3d 147, 153 (3d Cir. 1995) (quoting United States v. Salamone, 800 F.2d 1216, 1226 (3d Cir. 1986)). The trial judge has the advantage of observing the juror's conduct and the ability to evaluate the juror's answers during voir dire, thus the trial judge is afforded ample discretion as to whether the juror should be excused for cause. United States v. Calabrese, 942 F.2d 218, 227 (3d Cir. 1991).

---

[14] Defendant did not raise the issue of emotional distress damages during either of his Rule 50(a) motions and thus, the issue was not properly preserved for a Rule 50(b) motion. Accordingly, the Court considered this issue only in the context of defendant's motion for a new trial.

In examining whether a potential juror should be excused for cause, the Court's inquiry must be whether the potential juror "holds a particular belief or opinion that will prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Kirk, 61 F.3d at 153 (quoting Salamone, 800 F.2d at 1226). "A juror is impartial if he or she can lay aside any previously formed 'impression or opinion as to the merits of the case' and can 'render a verdict based on the evidence presented in court.'" Id. (quoting United States v. Polan, 970 F.2d 1280, 1284 (3d Cir. 1992)).

During voir dire, when asked if she or a member of her family had participated in or been a party to a lawsuit, Juror 8 responded that her husband had been a plaintiff in a personal injury action. Tr.1 at 70:14-25. When the Court inquired as to whether that lawsuit would affect her ability to render a fair and impartial verdict, Juror 8 first indicated it would. Id. at 71:1-3. The Court took her to side bar to conduct further voir dire on the matter, asking her how her husband's case would affect her ability to render an impartial verdict. Id. at 71:6-15. Juror 8 stated only, "I am skeptical." Id. The Court asked the juror to articulate why she was skeptical and she then revealed her son had been murdered and she felt the District Attorney mishandled the case. Id. at 71:16-21. The Court again asked her if that would affect her

ability to render a fair verdict and she responded only, "yeah." Id. at 71:25-72:2.

After asking for input from counsel, the Court declined to strike Juror 8 for cause, finding her statements on her inability to serve impartially lacked credibility. Id. at 72:6-24. Defense counsel did not object to the empaneling of Juror 8 or request further voir dire. Defense counsel merely reiterated that Juror 8 seemed to be skeptical of the system. Id. at 71:11-13. However, defendant now contends the empaneling of Juror 8 constituted reversible error and a new trial is warranted. Def.'s Br. at 35. It is not insignificant that defendant makes this argument even though at trial it did not ask for Juror 8 to be examined further.

Defendant's contentions are not supported by the record. The Court conducted ample voir dire of Juror 8, taking the juror to sidebar and asking additional questions when she expressed doubts about her ability to serve. The Court evaluated the juror's demeanor and answers to the Court's questions and determined her statements lacked credibility and there was no reason to strike her for cause. At no time did Juror 8 indicate she had any bias against either plaintiff or defendant. She merely expressed she was "skeptical." She did not indicate what she was skeptical of nor did she articulate how that skepticism would affect her ability to serve impartially. Accordingly, the Court exercised its discretion, electing not to strike her for cause. There is nothing

in the record to indicate Juror 8 could not, or did not, serve impartially. Accordingly, a motion for a new trial on this ground is not warranted.[15]

### 6. The Verdict Was Not Against the Weight of the Evidence

Last, defendant contends the verdict was against the weight of the evidence, and therefore, a new trial should be granted. Def. Br. at 32. When a District Court grants a motion for a new trial finding the verdict was against the weight of the evidence, the court "necessarily has substituted its judgment of the facts and the credibility of the witnesses for that of the jury." Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991). Therefore, courts "should only grant a new trial on that ground, if a miscarriage of justice would result by allowing the verdict to stand." Id. In other words, the verdict must shock the Court's conscience. Id. at 1353. Further, "[i]f the subject matter of the litigation is simple and within the understanding of a layman, the district court has less freedom to grant a new trial." Id. The verdict in this case does not shock the conscience of the Court nor does it result in a miscarriage of justice. Thus, a new trial is not warranted.

---

[15] Defendant did not raise this issue in either of the Rule 50(a) motions and thus, the issue was not properly preserved for the purpose of a Rule 50(b) motion. Accordingly, the Court considered the argument only in the context of defendant's motion for a new trial.

Under the McDonnell Douglas framework, plaintiff had the initial burden to show his prima facie claim of age discrimination. To do so, plaintiff was required to show: (1) he was a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) he was ultimately replaced by someone who was significantly younger. McDonnell Douglas, 411 U.S. 792 (1973). Plaintiff met each factor by showing 1) he was 57 years old at the time of his discharge; 2) he held, and was qualified for the job of store manager for years prior to his discharge; 3) he suffered adverse employment action in the form of a discharge; and 4) he was replaced by Nicholas Librizzi who was in his 20s. Once plaintiff established his prima facie case, the burden shifted to defendant to "articulate some legitimate, nondiscriminatory reason" for plaintiff's discharge. Id. at 802. Here, defendant's proffered reason was plaintiff's poor performance. Once defendant met this burden, the burden shifted back to plaintiff, who was then required to show, by a preponderance of the evidence, that the employer's explanation was pretext. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Plaintiff provided sufficient evidence to support a finding that defendant's proffered reason for plaintiff's termination—his poor performance—was pretext. Plaintiff presented evidence of the numerous awards he received throughout his time with the company and the store moved from a "D" to a "B" while he was manager. Tr.

1 at 115:17-116:15; 139:11-140:25. Plaintiff also presented evidence of other younger managers in the same region who received PEP scores below 300, yet they were not discharged or placed on a Red Store Action Plan. See Trial Ex. P6(B). Plaintiff also presented evidence of Gosseaux's satisfaction with plaintiff's performance as evidenced by his positive comments on reviews. Tr.2 at 310:18-312:5. Plaintiff presented evidence of alleged ageist comments on the Red Store Action plan, including reference to plaintiff's "same old ways" and plaintiff needing to "grow" with the company. Id. at 251:3-16; 282:16-283:3. Thus, plaintiff presented sufficient evidence from which a jury could find, by a preponderance of the evidence, defendant's proffered reason for plaintiff's discharge was pretext. Further, the subject matter of the case—age discrimination—is well-within the understanding of the lay juror and the verdict does not "shock the conscience." Because the verdict was not against the weight of the evidence, a new trial is not warranted.

**Conclusion**

For all the foregoing reasons, defendant's motion seeking judgment as a matter of law or, in the alternative, a new trial, is denied. An appropriate Order confirming the Court's ruling will be entered.

s/Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

Dated: February 28, 2018